THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* GARLAND LATTA and INVESTORS' UNDERWRITING CORPORATION, Defendants.

Supreme Court, Onondaga County, February 22, 1930.

*Hamilton Ward, Attorney-General* [*Alexander L. Saul* and *Leonard R. Lipowicz, Deputy Attorneys-General,* of counsel], for the plaintiff.

*Hiscock, Williams & Cowie* [*LeRoy B. Williams* of counsel], for Investors' Underwriting Corporation.

*Bond, Schoeneck & King* [*Chester B. Rifenbary* and *William Johnson* of counsel], for Nathan Abelson, temporary receiver.

*Thomas Woods,* for William F. Barnard.

*John H. McCrahon,* for L. W. Emerick and various other creditors.

SAWYER, Official Referee. This action is brought under the so-called Martin Act (Gen. Bus. Law, art. 23-A) to enjoin defendants from continuing the business in which they are engaged and for the appointment of a receiver to liquidate the same for the benefit of their creditors.

The statute in question was added to the General Business Law by chapter 649 of the Laws of 1921 and has since been much strengthened by sundry amendments. Its object is to prevent frauds upon the public in the sale of stock, bonds and similar securities. It provides that the Attorney-General may examine the books and business affairs of any person or corporation whom he has reason to believe falls within its prohibiting scope, and when it shall be made to appear from evidence satisfactory to him that the business is in fact fraudulently conducted, he is authorized to bring an action of this kind. It has been said by the Court of Appeals to be " remedial in its character. * * * The purpose is to prevent all kinds of fraud in connection with the sale of securities and commodities and to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited. * * * The words 'fraud' and 'fraudulent practice' in this connection should, therefore, be given a wide meaning so as to include all acts, although not originating in any actual evil design or contrivance to perpetrate fraud or injury upon others, which do by their tendency to deceive or mislead the purchasing public come within the purpose of the law. * * * Promoters are under a duty to make reasonable investigation before issuing a prospectus and to the extent that they fail in the performance of their duty, lack of *scienter* will not relieve them from liability in actions brought under the Martin Act." (*People* v. *Federated Radio Corp.*, 244 N. Y. 33.)

My study of the testimony in the instant case, had in the light of that explanation of the nature and scope of the statute, leads me to the conclusion that defendants have brought themselves squarely within the provisions of the statute and that the action must be sustained.

The defendant Garland Latta has, for a number of years, been a dealer in investment securities of various kinds and held himself out to the public as an expert in that business.

The defendant Investors' Underwriting Corporation is a domestic corporation which, with its precedessor companies under the same management, has been in operation since October, 1924, this particular company having been organized some time in 1927.

Until October, 1929, its authorized capital stock consisted of 10,000 shares of preferred of the par value of $100 a share, 10,000

shares of class A of no par value and 40,000 shares of common stock of no par value, the voting power of the company being vested in the class A and common stock.

September 28, 1929, the stockholders altered this capital structure by eliminating all the class A stock and providing for 50,000 shares, no par value, of preferred and 200,000 shares, no par value, of common stock; the resolution changing the structure also made provision for the exchange of the outstanding units of stock on the basis of five shares of the new preferred stock for each one of preferred and four shares of new common stock for each share of class A stock and common stock then outstanding.

At the commencement of this action there was in the hands of the public about $560,000 of the original preferred and class A units and a very little of the new type thus created. Of the original stock none of the common had been sold to the public. There had been, however, to September 30, 1929, 22,228 shares issued to another domestic corporation known as the Union Bond and Share Company, Inc., of which issue comment will be made later.

Defendant Garland Latta was the president of both the defendant Investors' Underwriting Corporation and of the Union Bond and Share Company, Inc., the latter being advertised as the transfer agent of the former. One Thomas W. Egan was the secretary of both corporations and J. George LeFaivre was their treasurer and auditor, while the three together constituted the board of directors of both. As a matter of fact Mr. Latta was the directing spirit of both corporations.

The capital stock of the Union Bond and Share Company, Inc., consisted of 1,200 shares which had been originally sold to Mr. Latta at ten cents per share, $120 for the issue. Some of this he seems to have disposed of but he still owns either 875 or 885 shares which of course leaves him in control.

The Investors' Underwriting Corporation is one of a type of financial enterprises that has come into prominence during recent years, their stock being sold to the public and the commingled net proceeds invested by the company for the benefit of its stockholders, who are supposed to thereby secure the services of expert business men and thus insure the safety of their capital investments and enhanced dividends.

The managers of such a corporation are bound, both in law and good morals, to treat these capital investments of its stockholders as trust funds and to use the highest good faith and conservative business diligence in their handling. Speculation and gambling with them cannot be countenanced and the courts will be swift in protecting innocent investors from such evils.

Here was a signal failure in the performance of that duty with the result that the defendant Garland Latta has become entirely insolvent and the defendant corporation has suffered an impairment of its investors' capital to the extent of at least $100,000. The loss is doubtless much greater and probably $200,000 will be found more near to the exact figures.

At the trial no attempt was made to marshal the personal assets and liabilities of Mr. Latta. My conclusion as to his insolvency is based upon the fact that the books of his dealings as fiscal agent and as an individual broker show him insolvent as to those transactions and it is to me inconceivable that a man of his ability and experience would, if solvent in fact, resort to the financial expedients and lapses to which he turned during the months of October and November, 1929. If he had been possessed of outside resources with which to protect himself, it is unlikely that he would have for that purpose resorted to the shady transactions of which the testimony shows him to have been guilty.

Of the amount paid by the investors for each unit of preferred and class A stock combined, $20 was allotted to the fiscal agent as a commission for making the sales. That is, if the unit was sold for $120, the defendant corporation received $100, for $140 the defendant corporation received $120, and likewise if for $150, the net amount received was $130. It is conceded that at the outset Mr. Latta was the fiscal agent of the corporation, having charge of the sales of its stock. Two sets of books were kept, one for him and one for the corporation. In Mr. Latta's books were credited the amounts received from sales of stock and charged against them were the payments to defendant corporation, those to agents for selling, which was usually $15 per unit, together with the other expenses of the business. On the corporation books were credited the net amounts received from Mr. Latta for the units sold and opposite was charged investments, interest paid and some small current expenses. Thus business continued until May 29, 1928, when the board of directors adopted a resolution authorizing a contract with the Union Bond and Share Company, Inc., as sole sales agent for the preferred and class A units, authorizing that corporation to retain any sums in excess of $100.10 per unit received by it for stock sold through its instrumentality and also providing that for each unit sold, netting defendant corporation $100.10, there should be issued to said Union Bond and Share Company, Inc., for ten cents a share, four shares of the common stock of the defendant corporation; defendant company further bound itself not to sell any of the original issue of common stock except to the Union Bond and Share Company, Inc. Analyzed, this means that for every share

vote in the defendant corporation acquired by an investor Mr. Latta, who owned the Union Bond and Share Company, Inc., was to receive four for the nominal value of forty cents. The question arises, what show for his protection did the person have who had put in real money?

Notwithstanding this apparent change of the fiscal agency from Mr. Latta to the Union Bond and Share Company, Inc., no actual change followed. Up to that time the business of the corporation, including sales of stock, had been transacted by Mr. Latta. He thereafter continued its business in the same manner as before, although it seems to be claimed that he, being the president and owner of the Union Bond and Share Company, Inc., from thenceforth acted for it and not in his individual capacity. If so, the shift was but nominal. No new set of books was opened nor were the accounts of Garland Latta, as fiscal agent, changed over to the Union Bond and Share Company, Inc. Everything went along just as before and but for the resolution in question and the fact that large blocks of common stock of the defendant corporation were later issued to it, the Union Bond and Share Company, Inc., did not show in the picture.

The first year of Mr. Latta's business as fiscal agent had resulted in a profit to him of $2,500. This sum he divided with one Emil Roth, Jr., who, under the title of sales manager, was in substantial charge of the business of selling these stocks. The following years produced increasingly heavy losses and on April 4, 1929, ten months after the alleged appointment of the Union Bond and Share Company, Inc., as sales agent, the directors of the defendant corporation adopted a resolution which, after reciting that the overhead expenses of the sales office had exceeded the net sum of $5 received by Mr. Latta from the $20 commissions, provided that thereafter *he* should receive a salary of $150 per week commencing the 1st day of April, 1929, and that any deficit accruing on his books " each month of the continuance of his relationship therewith as President and Fiscal Agent and arising by reason of *his* acting in that capacity " should be paid to him by the corporation. The resolution then further provided that in consideration of his accepting the terms of the resolution, the deficit existing to that date, in his accounts as fiscal agent, as shown by his books, should be taken over by the corporation and his account credited therewith.

In other words, notwithstanding the resolution of May 29, 1928, the defendant company recognized that Mr. Latta had continued and still was such agent. It assumed all his losses and arranged to thereafter pay him for his services, instead of a commission, a salary of $150 a week together with all the expenses of his office.

Some time later there was credited to Mr. Latta and charged to the expense account of the defendant corporation, by two or three entries, net losses from the beginning to October, 1929, amounting to $75,995.81, and also credited to him for a part of the time that intervened between April 4, 1929, and then, the $150 per week salary. In the light of all these circumstances I am persuaded that the resolution of May 29, 1928, was a subterfuge, only adopted as a means whereby Garland Latta, through his ownership of the Union Bond and Share Company, Inc., might intrench himself in the control of the defendant corporation as against its real owners; that the common stock issued in pretended conformity with its terms was improperly and fraudulently diverted from the defendant corporation and no real ownership thereof became vested in the Union Bond and Share Company, Inc.

From time to time throughout the life of the defendant corporation Mr. Latta withdrew from it considerable sums of money without, so far as appears, authorization therefor.

Somewhat early in the history of the company an examination by the Attorney-General developed that $35,000 had been withdrawn from the company's money by Mr. Latta, and he upon demand returned same. However, he shortly after again withdrew it in small amounts, through the medium of the Union Bond and Share Company, Inc., and continued such withdrawals until, by November 30, 1929, he had appropriated to his own use approximately $120,000 over and above the amount to his credit for commissions and salary.

These sums so taken were charged to the Union Bond and Share Company, Inc., without explanation. Whether a final diversion of $25,000 was included in this amount I am uncertain but probably not, in which event the total would be increased by that amount.

After the resolution of May 29, 1928, and in pretended compliance with its authority, common stock of the defendant corporation was issued to the Union Bond and Share Company, Inc., until it held from that source upon September 30, 1929, 18,228 shares. It also held 4,000 shares received in exchange for 1,170 shares of Physician Building Company stock transferred by it to the defendant corporation at an agreed valuation of $14,000.

This deal furnishes an interesting example of the devious ways by which this defendant corporation contributed to the enrichment of its promoter. Before June 30, 1927, Mr. Latta became interested in an enterprise then known as the Physicians Building Realty Company, which, as I understand, was later changed into the defendant Investors' Underwriting Corporation. That company

owned a building upon Genesee street in the city of Syracuse used by doctors for office purposes. That building, subject to a mortgage, was acquired by Mr. Latta, he borrowing from the Union Bond and Share Company, Inc., something like $50,000 with which to pay for the equity. He then organized what is now known as the Physicians Building Corporation, 500 shares of preferred stock in which he secured in exchange for his equity in the building; there was also issued to him 1,200 shares of its common stock for ten cents per share for which he, presumably, paid in cash. The 500 shares of preferred stock, together with either 100 or 400 of the common stock (I am unable to definitely decide just which), he turned over to the Union Bond and Share Company, Inc., in payment of the amount he had borrowed. A second block of 400 shares of the common he turned over to the same company as a sort of donation for the use of the money he had borrowed and possibly also in payment of the difference between the $45,000 paid for the equity in the building and the $50,000 loaned him; while another block of 400 shares of common he sold outright to that company for $12,000; this would seem to have been a sufficient profit on stock that only cost him $120. The going was good, however, so on the same day the Union Bond and Share Company, Inc. (which was himself), sold 1,170 of the 1,200 shares of common to the defendant corporation for $14,000, receiving in payment therefor the 4,000 shares of the common stock above referred to.

There is testimony to the effect that there was issued 500 shares of defendants' class A stock and 4,000 shares of its common in exchange for but 700 shares of the Physicians Building Corporation stock; this differs somewhat from the explanation later developed from the witness Powelson, which I have followed as seeming the more likely. The discrepancy is, moreover, of little importance in view of the undisputed fact that out of a total investment of $120 Mr. Latta obtained for his Union Bond and Share Company, Inc., which he owned and controlled, 4,000 of the common shares of the agreed value of $14,000, but, even though that was excessive price from a market standpoint, it was worth it to him because of its voting power; the stock constituted an anchor to the windward.

Eighteen thousand two hundred and twenty-eight shares of common stock issued to his bond and share company, ostensibly under the authority of the resolution of May 29, 1928, was not paid for in cash but was charged by defendant corporation to the Union Bond and Share Company, Inc. When dividends were declared thereon they were credited to the account so that the agreed price of ten cents per share was offset by such dividend credits and the surplus left available to the bond and share com-

pany. These dividends totaled $97,020, which should have been a satisfactory income on an investment of $120.

To and including October 31, 1929, the dividends declared upon the preferred and class A stock held by *bona fide* investors, each of whom had paid at least $100 per share into the defendant corporation, besides the commissions retained by Mr. Latta as fiscal agent, amounted to only $112,179.18.

It will be remembered that Mr. Latta had bought all the capital stock of the Union Bond and Share Company, Inc., for $120; and that company by its ownership of 22,228 shares of common stock of the defendant corporation had acquired its control; after September, 1929, that control was greatly strengthened by the issue to it of additional common stock so that at the beginning of this action the holders of the preferred and class A stock were at the mercy of Mr. Latta and his associates.

On the 31st day of October, 1929, the Union Bond and Share Company, Inc., when it had but $300 in cash in its treasury, but large credits on the books of the defendant company, declared a dividend payable upon November 20, 1929, of $94 per share, over $83,000 of which would have been payable to Mr. Latta. It was doubtless intended to apply these dividends toward payment of his deficit of more than $120,000 owing the defendant corporation; even so, after the credit he would have been still overdrawn more than $55,000 and with nothing in sight from which to pay.

The original plan of the corporation defendant was to use its investors' money for the financing of business projects which had fair prospect of safety and profit, and large amounts were actually invested by it in various subsidiary corporations. Three or four of them were apartment house ventures; one a so-called investment underwriting corporation; another an aeroplane field and flying organization called the Empire Air Transport Company. These, together with other enterprises of lesser magnitude, constituted what may be termed its legitimate investments.

The Empire Air Transport Company presents a curious example of the character of investments Mr. Latta advertised to the public as " seasoned." It was organized by himself and Mr. Roth with funds of the defendant corporation. It was incorporated with a stock structure of 3,000 shares (later changed to 5,000), of which 2,800 shares were issued to one William F. Barnard, 100 shares to Thomas Egan, whose relation to the defendants has been pointed out, and 100 shares to Mr. Roth, for which he paid only a nominal sum. Mr. Roth was its manager from the start until his resignation on September third, three or four months later. At the time of his resignation he was indebted to the Investors' Underwriting

Corporation in the sum of more than $21,000 and upon his resignation that corporation purchased his stock for $22,000, credited the purchase price to his account, and thus wiped his slate clean at practically no cost to him beyond a few months' time and work. His successor as manager, equally competent, was employed at a salary of $5,000 per year and $22,000 was vastly more than the stock was worth. The purchase was either a rank favoritism at the expense of the stockholders or was carried through as the only means of collecting a bad debt. If the latter, the query arises, would a well-managed business institution permit a mere employee, who had small financial resources, to contract to it so considerable an obligation? It is also worthy of note that the stock is still carried on the books of the defendant corporation as an asset for the full purchase price of $22,000.

Not one of these investments of the Investors' Underwriting Corporation has ever paid a dividend. On the contrary, practically every one of them has been a drain upon its resources. Advances made to keep them going represent a total investment of many thousands of dollars. It is a striking commentary upon the business judgment exercised that, with few exceptions, every one of them has turned out to be a money loser, while those that have held their own were of minor importance and their profits negligible. There came a time when Mr. Latta's attention turned to the stock market and he began a series of speculations, financed partially with the money intrusted to the defendant corporation for safe investment and partially by marginal borrowings, politely called in the trade " brokers loans." That this course of dealing was known to and approved by his fellow directors seems clear, although every dollar so used was a breach of their duty to the investing stockholders. It will not be forgotten that the resolution of April 4, 1929, had contained the provision that, if Mr. Latta sold any securities other than those of the Investors' Underwriting Corporation, his commissions thereon were to be credited to his personal account.

For a year or thereabouts before November, 1929, corporation stocks and similar securities were floating upon a bull market and the Underwriters Corporation, on paper, profited by those conditions; enough so that the balance sheet of August 31, 1929, showed stock holdings amounting to $1,924,903.30, of which $634,412.66 was market appreciation. As against this there was a marginal liability of $1,154,090.42, leaving a net asset in marketable stocks of $770,812.88. This, together with other assets shown upon the sheet, indicated a large surplus over the companies' debts and liabilities, including issued capital. It is needless to say that

this supposedly happy state of affairs was promptly brought to the attention of the investing public. Then came the market break of early November. Defendants were caught unprepared and their paper profits melted away almost over night; marginal demands they were largely unable to meet; their holdings were mostly sold at great loss; by November thirtieth the defendant corporation because of these losses and depreciation in values had left securities worth only $103,454.73, a shrinkage from August thirty-first of $1,821,449.57, and no money or property in place of the difference.

There is a wide gulf between investing and gambling. In my opinion this feature alone warrants the interference of the Attorney-General. Nearly all the prospecti and advertisements of the defendant corporation were signed by " Garland Latta, Investment Specialist." The pleadings admit that he was at the times mentioned maintaining offices in the city of Syracuse and elsewhere and was engaged therein in " the business of stock broker, in issuing, selling, dealing, purchasing, promoting, negotiating, advertising and distributing of stock, bonds, notes, evidences of interest or indebtedness and other securities as an unlisted broker and dealer in securities in the State of New York."

The resolution of May 29, 1928, while in many respects ambiguous, recognizes him in that individual capacity. It attempts to empower him, as fiscal agent, to go outside the business scope of the defendant corporation, and in the same breath authorizes him to keep for himself the profits, commissions, etc. Whether the resolution was intentionally blind or otherwise, Mr. Latta understood that it authorized him to embark upon an outside business for his own profit, and thereafter in addition to the affairs of the defendant corporation, its allied and subsidiary organizations and those as its fiscal agent, he engaged in the business of buying stocks upon commission for individual customers, dealing almost entirely in Central States Electric stock and American Cities Power and Light B stock. Apparently these were valid and substantial securities. He arranged with the company underwriting them for a price which netted him one dollar per share upon every one he sold to his customers and in addition he charged and collected from them the commission usually charged by brokers for such services. Whether the American Securities Company, from whom he obtained the stock, knew that he was " getting his going and coming " does not appear but it is unlikely that he informed his customers of the deviation from the well-understood rules governing the relations between a broker and his principal.

For a time this individual brokerage business seems to have run

along satisfactorily, but after the market began to sag, and from then until it finally broke, Mr. Latta became more and more pressed by obligations and, as has many times happened with others, ultimately lost sight of the distinction between mine and thine. Money received from customers for the purchase of securities was mingled by him with other moneys in his possession and expended for his own benefit. Securities ordered and paid for by customers were not, in many cases, bought and delivered until long after due and in many cases never were. Stocks of customers intrusted to him for sale and reinvestment of the proceeds at times were used to protect his own marginal accounts and, in some instances, those of the defendant corporation; in other cases they were sold and the proceeds used by him for himself. Moneys belonging to the corporation were drawn by him and used for his own purposes and in various other ways the rights and interests of his clients were ignored and their property converted to his own use.

When this action was begun and the temporary injunction procured nearly $40,000 of the money received from his customers, including stocks intrusted to him for sale, had been converted by him to his own use. No separate books of account for these personal transactions were set up, and the records, so far as kept at all, were made in the books of Garland Latta and those of the defendant corporation. The sale upon November third of 200 shares of North American common stock for $19,942 and the repurchase of the same upon November 7, 1929, for $18,502.50, with its resulting profit of $1,439.50, nowhere appears, nor does the sale of 500 shares of Central States Electric upon November 8, 1929, for $11,267.50, nor that of the 50 shares of North American on November 14, 1929, for $4,025.50. These and possibly other unentered transactions can only be traced by a reference to the bank accounts and brokers' accounts where the money for the stock was checked out or deposited. The bank accounts were in the names of the defendant corporation and of himself as an individual and as fiscal agent, and the moneys were not infrequently deposited therein indiscriminately and without regard to ownership.

Early in November, 1929, money and valuable stocks to the amount of $60,000 were borrowed by Mr. Latta in the name of the defendant corporation from one William F. Barnard and deposited with brokerage houses for the protection of defendants' marginal accounts. The agreement made with Mr. Barnard was that the money and securities should be returned to him upon demand, but shortly thereafter the stocks were mostly converted into money and the entire loan disappeared along with other assets of defendants.

At this same time there were laying in one of the Syracuse banks drafts upon Mr. Latta, with the shares of stock attached, for stock ordered and paid by his individual customers. While this situation existed he withdrew and appropriated to his own use from the moneys Mr. Barnard had loaned the investment company $25,000, expending some of it in connection with personal interests outside his brokerage business and leaving the stocks of his customers unpaid for.

These and other transactions portrayed in the testimony lead to my conclusion as to his actual insolvency. As already has been stated, it is not reasonable to suppose that any business man would so conduct his own affairs, to say nothing of those of his clients, if possessed of means sufficient to carry out his contracts. Men so situated do not ordinarily leave themselves open to the dangers of possible criminal prosecution.

From the beginning until shortly before the end, the sale of preferred and class A stock of the defendant corporation to innocent investors went merrily on. A large corps of sales agents was employed; they were furnished with seductive data and arguments concerning the solvency of the defendant corporation and the desirability of those stocks for safe and profitable investments. Advertisements were published in daily papers where the main office of the company was located and printed prospecti, containing alleged balance sheets, were circulated and used by the various salesmen in the solicitation of customers. Much of the stock was sold in the inducement of these representations.

It seems unnecessary to discuss in detail these various prospecti, circulars and advertisements. Some glaring misrepresentations will be pointed out but in the main all that is necessary is the general statement they were mostly untrue in fact and apparently designed to mislead the public. Three of them, i. e., those of August 27, 1928, November 5, 1928, and August 31, 1929, must have been particularly attractive to any prospective purchaser, because they were certified to be correct by " LeFaivre & Associates, Inc., by J. George LeFaivre, President. Public Accountants and Auditors." To the unsuspecting this certificate would convey the impression that the financial display was vouched for after a detailed and honest investigation of the corporation affairs made by a firm of responsible and disinterested public accountants. Nothing could be further from the truth. J. George LeFaivre was the same J. George LeFaivre who was the treasurer and auditor of both the defendant corporation and the Union Bond and Share Company, Inc. He is a public accountant holding a certificate issued in the District of Columbia. The words " & Associates,

Inc.," represent Mr. LeFaivre's wife and a man named Clinton Carr, neither of whom are accountants. That that certification was deliberately made and with intent to defraud the public seems to admit of no denial, a conclusion that is not qualified by the fact that the three have incorporated themselves for the general practice of accounting.

Until June, 1929, there were suppressed from these statements practically all the expenses connected with the sale of the stock. As presented to the public the defendant corporation was accumulating a large amount of money and property, declaring regular dividends in excess of those obtainable from ordinary investments and doing its business at a very moderate expense. In one of them the only items of expense, aside from interest, were for telephone, advertising and other office expenses totaling $282.10. This showing was made possible by the dual system of books. Those of the defendant corporation recorded income and those of Mr. Latta expenditures. The advertisements and prospecti were made up from the books of the corporation alone and they reflected only the income. The difficulty is that later, and after sufficient investment stock had been sold so that the ratio of expense would not seem disproportionately high when compared with the income, Mr. Latta's total losses, amounting to more than $75,000, were charged over to the company. One cannot but wonder whether, if he had made a profit instead of a loss, its disposition would not have been similar to that of the first and only year's profit, i. e., an appropriation of same to himself and any other with whom he might see fit to divide. Some of the later published balance sheets, under the head of current assets, included accounts receivable and notes receivable (so-called). That of August 31, 1929, stated these items to be respectively $316,064.17 and $129,547. As a matter of fact they were not current assets and largely neither accounts receivable nor bills receivable. Nearly all the enterprises in which the money of these stockholders had been legitimately invested were losing propositions and demanded from the defendant corporation continued advances. These advances were carried on the books of the defendant as moneys due from the subsidiaries and as assets in their full amounts. So far as they were assets at all they fell under the class known as frozen. They were devoid of liquidity and unavailable in connection with the current affairs of the corporation.

Most of the money had been expended and repayment in full was impossible and could not have been expected. The most astonishing confusion between money expended and assets appears in the prospectus and balance sheet of August 31, 1929, which

contains an item, " Receivable from fiscal agent for capital stock sold, $188,869.54." To this is appended, in small type, the notation: " This amount of money is being retained by the fiscal agent with the consent of the corporation for the purpose of financing transactions incident to the selling of securities of the corporation." This was a falsification pure and simple and could have been included among the assets for no other reason than to convince a prospective investor that that amount of cash was in hand, available at any time for the purposes of the company. As a matter of fact it represented but a comparatively small amount of cash received by Mr. Latta for stock sold. It included losses he had made amounting to $14,000; moneys advanced to him in excess of $47,000; moneys that he had advanced to his salesmen for their expense, little, if any, of of which was collectible; and other claims receivable of little or no value. Mr. Latta, who prepared and signed the prospectus to which the statement is attached, and who was the Investors' Underwriting Corporation, must have known that he was insolvent and that the claims against him were of little value. It is interesting to note that the correctness of this particular balance sheet was also certified to by " LeFaivre & Associates, Inc."

Beginning with November 5, 1928, down to and including September 12, 1929, these prospecti were issued at intervals of one or two months and, in addition, advertisements of the company were carried in the daily papers in the city of Syracuse. A number of the salesmen have testified that they were used in the marketing of the stocks and that large sales were made in reliance by the purchaser upon their truthfulness.

Without going further into detail, they are each and every one subject to the general criticism of being false and misleading, either in the minimizing of expenses, the exaggeration of assets or actual misrepresentation of the book accounts as being assets when they were in fact not assets and in some instances were dangerously near being liabilities.

In this discussion I have only referred to what may be termed the high lights. The evidence contains other instances of improper conduct by these defendants in the handling of their business. More than sufficient has, however, been said to demonstrate that this is a situation against which the statute was intended to guard and to point out the reasons for my conclusion as stated at the outset.

Judgment is directed for plaintiff against both defendants, with costs. Findings signed.